## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

FRANKIE RENEE GILMORE,           )
                                 )
                Plaintiff,       )
                                 )
        v.                       )        1:21CV420
                                 )
KILOLO KIJAKAZI,                 )
Acting Commissioner of Social    )
Security,                        )
                                 )
                Defendant.[1]    )


## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Frankie Renee Gilmore, brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Acting Commissioner of Social Security, denying Plaintiff's claim for Supplemental Security Income ("SSI"). (Docket Entry 1.) Defendant has filed the certified administrative record (Docket Entry 9 (cited herein as "Tr. __")), and both parties have moved for judgment (Docket Entries 13, 18; see also Docket Entry 14 (Plaintiff's Memorandum); Docket Entry 19 (Defendant's Memorandum); Docket Entry 20 (Plaintiff's Reply)). For the reasons that follow, the Court should enter judgment for Defendant.

_____

[1] President Joseph R. Biden, Jr., appointed Kilolo Kijakazi as the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted for Andrew M. Saul as the Defendant in this suit. Neither the Court nor the parties need take any further action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

# I. PROCEDURAL HISTORY

Plaintiff applied for SSI (Tr. 245-50), alleging a disability onset date of April 12, 2018 (see Tr. 245).[2]  Upon denial of that application initially (Tr. 102-20, 144-48), and on reconsideration (Tr. 121-39, 152-61), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 162-64).  Plaintiff, her non-attorney representative, and a vocational expert ("VE") attended the hearing.  (Tr. 35-78.)  The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act.  (Tr. 7-24.)  The Appeals Council denied Plaintiff's request for review (Tr. 1-6, 242-44), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that disability determination, the ALJ made the following findings, later adopted by the Commissioner:

> 1.   [Plaintiff] has not engaged in substantial gainful activity since April 12, 2018, the application date.
>
> . . .
>
> 2.   [Plaintiff] has the following severe impairments: degenerative disc disease of the cervical spine and degenerative disc disease of the lumbar spine.
>
> . . .
>
> 3.   [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals

---

[2] Plaintiff previously applied for Disability Insurance Benefits ("DIB") in July 2014 and, after denials at the initial and reconsideration levels (see Tr. 82, 103, 122), an ALJ denied that claim on November 23, 2016 (Tr. 79-91). Following the Appeals Council's denial of Plaintiff's request for review (Tr. 96-101), she did not seek further review of that final decision by the Commissioner (see Tr. 103, 122).

2

the severity of one of the listed impairments in 20
C.F.R. Part 404, Subpart P, Appendix 1.

. . .

4. . . . [Plaintiff] has the residual functional
capacity to perform light work . . . except she can sit
and be on her feet (whether standing, walking, or some
combination thereof) for 30 minutes at a time, then must
be able to alternate position for up to 30 minutes,
resulting in four hours each of sitting and standing
and/or walking. She can occasionally climb, balance,
stoop, kneel, crouch, and crawl. She can occasionally
work around unprotected heights, moving mechanical parts,
dust, odors, fumes and other pulmonary irritants, and
extreme heat. She can occasionally operate a motor
vehicle (within the sitting limitations defined herein).

. . .

5. [Plaintiff] is unable to perform any past relevant
work.

. . .

9. Considering [Plaintiff]'s age, education, work
experience, and residual functional capacity, there are
jobs that exist in significant numbers in the national
economy that [she] can perform.

. . .

10. [Plaintiff] has not been under a disability, as
defined in the . . . Act, since April 12, 2018, the date
the application was filed.

(Tr. 12-24 (bold font, internal parenthetical citations, and

footnote omitted).)

## II. DISCUSSION

Federal law "authorizes judicial review of the Social Security

Commissioner's denial of social security benefits." <u>Hines v.

Barnhart</u>, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of

3

[the Court's] review of [such a] decision . . . is extremely limited." <u>Frady v. Harris</u>, 646 F.2d 143, 144 (4th Cir. 1981). Plaintiff has not established entitlement to relief under the extremely limited review standard.

### A.  Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard." <u>Hines</u>, 453 F.3d at 561 (internal brackets and quotation marks omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Hunter v. Sullivan</u>, 993 F.2d 31, 34 (4th Cir. 1992) (quoting <u>Richardson v. Perales</u>, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001) (brackets and internal quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." <u>Hunter</u>, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility

4

determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3] "To regularize the

_____

[3] The Act "comprises two disability benefits programs. The Disability Insurance Benefits Program provides benefits to disabled persons who have contributed to the program while employed. [SSI] . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

5

adjudicative process, the Social Security Administration [('SSA')] has . . . promulgated . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id. (internal citations omitted).

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity [('RFC')] to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[4] A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not,

_____

[4] "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the [government] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's [RFC]." Id. at 179.[5] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. See id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the government cannot carry its "evidentiary burden of proving that

_____

[5] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

7

[the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. <u>Hines</u>, 453 F.3d at 567.[6]

## B.  Assignments of Error

Plaintiff asserts that the Court should overturn the ALJ's finding of no disability on these grounds:

1) "[t]he ALJ failed to properly evaluate Plaintiff's limitations due to pain in the RFC" (Docket Entry 14 at 3 (bold font omitted); <u>see also</u> Docket Entry 20 at 1-4); and

2) "[t]he structure of the SSA is constitutionally invalid" (Docket Entry 14 at 14 (bold font omitted)).

Defendant contends otherwise and seeks affirmance of the ALJ's decision.  (<u>See</u> Docket Entry 19 at 11-30.)

## 1. Evaluation of Pain

In Plaintiff's first assignment of error, she maintains that "[t]he ALJ failed to properly evaluate Plaintiff's limitations due to pain in the RFC."  (Docket Entry 14 at 3 (bold font omitted); <u>see also</u> Docket Entry 20 at 1-4.)  More specifically, Plaintiff contends that, despite her testimony regarding the impact of her pain on her ability to function (Docket Entry 14 at 3-4 (detailing

---

[6] A claimant thus can qualify as disabled via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five.  Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis.  <u>See, e.g.</u>, <u>Hunter</u>, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

such testimony (citing Tr. 46, 48-50, 52-56, 59-64))) and evidence
which "support[ed] that [Plaintiff] suffer[ed] from a condition
reasonably likely to cause the pain of which she testified" (id. at
7; see also id. at 7-12 (describing such evidence (citing Tr. 386,
459-62, 464-65, 472, 474, 574, 576, 658, 678-79, 686, 690-91, 700-
01, 706, 717-19, 724, 727-28, 732-33, 737, 750, 757, 760-62, 764-
65, 774, 777, 783, 789, 792-93, 798-802, 818-19, 878, 880, 928-31,
936, 948, 958-59, 1007-08, 1051, 1064, 1099, 1108, 1127, 1129-31,
1188, 1282, 1335, 1356, 1408, 1558-59))), the ALJ improperly relied
on normal neurological findings on examination to discount
Plaintiff's subjective reports of pain (see id. at 5; see also id.
("The ALJ cannot balance [Plaintiff's] severe, disabling pain
against her mild to moderate neurological deficits to find her 'not
disabled' – it does not work that way.  That [Plaintiff]'s strength
and reflexes were sometimes normal ha[d] no bearing on her
limitations from pain.")).

Additionally, Plaintiff faults the ALJ for "assign[ing] a
random value to the number of minutes . . . [Plaintiff] c[ould] be
expected to stand, walk or sit at one time," and contends that
"[t]he ALJ's finding that [Plaintiff] could stand, sit and walk for
30 minutes at a time before needing to change positions ha[d] no
basis in the testimony or the medical opinion evidence."  (Id. at
13.)  Plaintiff deems the ALJ's failure to properly evaluate her
pain "[s]ignificant[]" (id.), noting that, "even if [the ALJ] found

[Plaintiff] capable of the more appropriate RFC for sedentary exertion work (though she is not even capable of this), given her inability to perform her [past relevant work], her lack of transferable skills to a sedentary setting per the VE (*see* [Tr.] 74-75) and her being over 50 years old throughout the relevant time period, a finding of 'disabled' would be directed by [Rule 201.10 of the Medical Vocational Guidelines]" (<u>id.</u> at 13-14 (citing 20 C.F.R. Pt. 404, Subpt. P, App'x 2, § 201.10)). For the reasons that follow, those assertions entitle Plaintiff to no relief.

**a.    Over-Reliance on Objective Medical Evidence**

Plaintiff first challenges the ALJ's "balanc[ing of Plaintiff's] severe, disabling pain against her mild to moderate neurological deficits to find her 'not disabled,'" because Plaintiff maintains that her "[sometimes normal] strength and reflexes . . . ha[d] no bearing on her limitations from pain." (Docket Entry 14 at 5; <u>see also</u> Docket Entry 20 at 1-4.) According to Plaintiff, "[t]he [United States Court of Appeals for the] Fourth Circuit has repeatedly chided the SSA for relying on such negative [neurological] findings to discount limitations stemming from pain as opposed to weakness where an individual has shown by objective evidence a condition which can reasonably cause that pain." (Docket Entry 14 at 5.) Plaintiff notes that the Fourth Circuit has recognized that "pain in itself can be disabling" (<u>id.</u> (citing <u>Myers v. Califano</u>, 611 F.2d 980, 983 (4th Cir. 1980); <u>see</u>

10

also Docket Entry 20 at 2-3 (citing and quoting Walker v. Bowen, 889 F.2d 47, 49 (4th Cir. 1989), for same proposition)), as well as that, once a claimant has "'met [her] threshold obligation of showing by objective medical evidence a condition reasonably likely to cause the pain claimed, [a claimant] is entitled to rely exclusively on subjective evidence to prove the second part of the test, i.e., that [her] pain is so continuous and/or so severe as to prevent [her] from working a full eight hour day'" (Docket Entry 14 at 5-6 (quoting Hines, 453 F.3d at 565)). In Plaintiff's view, that "principle was reiterated in *Arakas*, where the [Fourth Circuit] noted that 'the ALJ effectively required objective evidence by placing undue emphasis on [the plaintiff]'s normal clinical and laboratory results.'" (Id. at 6 (quoting Arakas, 983 F.3d at 97).) Plaintiff further objects to the ALJ's alleged observation that Plaintiff's "straight leg raise [] tests for nerve root pain were usually negative" (id. (citing Tr. 22)), because she "was administered a[ straight leg raise] test on five different occasions and four out of those five were positive" (id. (citing Tr. 462, 718-19, 724, 728, 760)).

Social Security Ruling 16-3p, Titles II and XVI: Evaluation of Symptoms in Disability Claims, 2017 WL 5180304 (Oct. 25, 2017) ("SSR 16-3p"), consistent with the Commissioner's regulations, adopts a two-part test for evaluating a claimant's statements about symptoms. See SSR 16-3p, 2017 WL 5180304, at *3; see also 20

11

C.F.R. § 416.929. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms, such as pain." SSR 16-3p, 2017 WL 5180304, at *3. A claimant must provide "objective medical evidence from an acceptable medical source to establish the existence of a medically determinable impairment that could reasonably be expected to produce [the] alleged symptoms." Id. Objective medical evidence consists of medical signs ("anatomical, physiological, or psychological abnormalities established by medically acceptable clinical diagnostic techniques") and laboratory findings "shown by the use of medically acceptable laboratory diagnostic techniques." Id.

Upon satisfaction of part one by the claimant, the analysis proceeds to part two, which requires an assessment of the intensity and persistence of the claimant's symptoms, as well as the extent to which those symptoms affect his or her ability to work. See id. at *4. In making that determination, the ALJ must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." Id. Where

12

relevant, the ALJ will also consider the following factors in assessing the extent of the claimant's symptoms at part two:

> 1. Daily activities;
>
> 2. The location, duration, frequency, and intensity of pain or other symptoms;
>
> 3. Factors that precipitate and aggravate the symptoms;
>
> 4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
>
> 5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;
>
> 6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
>
> 7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

Id. at *7-8. The ALJ cannot "disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual." Id. at *5 (emphasis added).

In this case, the ALJ found, at part one of the subjective symptom analysis, that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but then determined, at part two, that Plaintiff's "statements concerning the intensity, persistence and limiting

13

effects of [her] symptoms [we]re not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in th[e ALJ's] decision." (Tr. 18.) The ALJ further supported that finding with the following analysis:

> After a careful review of the medical evidence and [Plaintiff]'s testimony, the [ALJ] finds [Plaintiff]'s allegations only partially consistent with the medical evidence of record. Although imaging has showed some progressive worsening of lumbar spine and cervical spine, objective signs at examinations have generally remained stable, with some intermittent findings of tenderness to palpation and sporadic reports of mild subjective sensory deficits. Straight leg raising was only positive in December 2018 and January and November 2019, and gait has consistently been normal. Strength and reflexes have consistently been intact. Treatment has be[en] routine and conservative with medication refills and some injections. Considering the fact that medical records do not always show the precise details of visits and examinations and that subjective feelings of pain and weakness may not be fully explored and[/]or evident on examination, the [ALJ] has given [Plaintiff]'s testimony some weight in balancing the subjective reports with the imaging and objective examination. Therefore, she should be able to perform light work, so long as she has the ability to alternate position every 30 minutes; only occasionally perform postural movements; only occasionally work around unprotected heights, moving, mechanical parts; dust, odors, fumes, and other pulmonary irritants; and extreme heat; and only occasionally operate a motor vehicle (within the sitting limitations defined herein).

(Tr. 22 (emphasis added).) For the reasons more fully explained below, neither of Plaintiff's challenges to that analysis carry the day.

To begin, Plaintiff overstates the reach of Arakas. That case holds only "that ALJs may not rely on objective medical evidence (or the lack thereof) — even as just one of multiple factors — to

14

discount a claimant's subjective complaints regarding symptoms of fibromyalgia or some other disease that does not produce such evidence." Arakas, 983 F.3d at 97 (emphasis added). Here, Plaintiff has readily admitted that objective evidence such as "radiographs" documents her lumbar and cervical degenerative disc disease. (Docket Entry 14 at 5 (citing Tr. 878-80).) Thus, unlike fibromyalgia, lumbar and cervical degenerative disc disease does not constitute a "disease that does not produce [objective medical] evidence," Arakas, 983 F.3d at 97.[7]

In addition, although Arakas "reiterate[d] the long-standing law in [the Fourth C]ircuit that disability claimants are entitled to rely exclusively on subjective evidence to prove the severity, persistence, and limiting effects of their symptoms," Arakas, 983 F.3d at 98, long-standing cases containing the substance of that holding, such as Craig and Hines (among others), clarify that, "[a]lthough a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be

---

[7] Plaintiff's reliance on Walker likewise does not aid her cause. (See Docket Entry 20 at 2-3.) Although that case involved a claimant who suffered from, among other impairments, diabetic neuropathy and degenerative joint disease, see Walker, 889 F.2ds at 48, i.e., "conditions which can [] produce objective findings with respect to sensation and strength on [physical examination]s" (Docket Entry 20 at 2), the Fourth Circuit in Walker did not hold that the ALJ erred by considering objective evidence in evaluating the intensity, persistence, and limiting effects of the plaintiff's symptoms, see id. at 49. Rather, the Fourth Circuit found that the plaintiff's pain constituted a non-exertional impairment that rendered erroneous the ALJ's reliance on the Medical-Vocational Guidelines to direct a conclusion of not disabled, id., circumstances absent here.

15

accepted to the extent they are inconsistent with the available evidence, including <u>objective evidence of the underlying impairment</u>, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers," <u>Craig</u>, 76 F.3d at 595 (emphasis added); <u>see also</u> <u>Hines</u>, 453 F.3d at 565 n.3 (quoting <u>Craig</u>, 76 F.3d at 595).

In other words, under the appropriate circumstances, an ALJ <u>may</u> choose to rely exclusively on a claimant's subjective symptom reports to find disabling symptoms; however, <u>Arakas</u> does not compel ALJs to consider <u>only</u> subjective evidence, as such a requirement would conflict with the Act itself and its implementing regulations, which plainly require ALJs to consider a variety of factors, including objective medical evidence, in evaluating the intensity, persistence, and limiting effects of symptoms. <u>See</u> 42 U.S.C. § 423(d)(5)(A) ("Objective medical evidence of pain . . . established by medically acceptable clinical or laboratory techniques (for example, deteriorating nerve or muscle tissue) <u>must</u> be considered in reaching a conclusion as to whether [an] individual is under a disability." (emphasis added)); 20 C.F.R. § 404.1529(c) (directing ALJs to assess a claimant's medical history, <u>medical signs and laboratory findings</u>, daily activities, testimony about nature and location of pain, medication and other treatment used to alleviate pain, along with medical opinions from examining and non-examining sources); <u>see also</u> SSR 16-3p, 2017 WL

16

5180304, at *5 ("[O]bjective medical evidence is a <u>useful indicator</u> to help make reasonable conclusions about the intensity and persistence of symptoms[ because] . . . [t]he intensity, persistence, and limiting effects of many symptoms can be clinically observed and recorded in the medical evidence. . . . A report of minimal or negative findings or inconsistencies in the objective medical evidence is <u>one of the many factors</u> [an ALJ] <u>must</u> consider in evaluating the intensity, persistence, and limiting effects of a[ claimant]'s symptoms." (emphasis added)).

Here, in compliance with <u>Arakas</u>, <u>Hines</u>, and <u>Craig</u>, the ALJ considered the objective medical evidence as <u>one part</u> of her evaluation of the intensity, persistence, and limiting effects of Plaintiff's symptoms. The ALJ additionally considered the opinion evidence of record (<u>see</u> Tr. 21-22) and, in particular, deemed the opinions from the state agency medical consultants that Plaintiff could perform a wide range of medium work (<u>see</u> Tr. 115, 133-34) "not persuasive" because the imaging evidence and <u>Plaintiff's testimony</u> warranted greater limitations (Tr. 22). Consistent with that finding, the ALJ also found "not persuasive" (Tr. 21) the prior ALJ's determination that Plaintiff could perform nearly a full range of medium work (<u>see</u> Tr. 87). The ALJ additionally commented on the type and effectiveness of Plaintiff's treatment, noting that Plaintiff's treatment for her degenerative disc disease had remained "routine and conservative" (<u>id.</u>; <u>see also</u> Tr. 19), and

17

that "signs and symptoms from [Plaintiff]'s spinal impairments ha[d] remained stable with continued conservative treatment, including Tizanadine [sic], naproxen, [and] gabapentin" (Tr. 20).

Moreover, Plaintiff's contention that the ALJ erred by "balanc[ing Plaintiff's] severe, disabling pain against her mild to moderate neurological deficits to find her 'not disabled'" (Docket Entry 14 at 5) fares no better. That contention glosses over the fact that, in addition to pain, Plaintiff consistently alleged numbness, tingling, and weakness in her upper and lower extremities. (See Tr. 17 (ALJ's acknowledgment of Plaintiff's reports that "her pinched nerves cause[d] unbearable pain[ which] . . . travel[ed] down her arms, worse on the left, non-dominant arm, causing numbness and tingling" and that "she drop[ped] things and wa]s unable to open things due to weakness in her hands"); see also Tr. 62-63, 374, 394, 472, 574, 773-74, 780, 789, 1514, 1558 (Plaintiff's reports of numbness, tingling, and weakness).) Accordingly, the ALJ did not err by relying on normal (or mild) findings regarding Plaintiff's strength, reflexes, and sensation, because such findings hold direct relevance to the evaluation of the intensity, persistence, and limiting effects of Plaintiff's alleged numbness, tingling, and weakness.

Plaintiff additionally challenges the ALJ's purported remark that Plaintiff's "straight leg raise [] tests for nerve root pain were usually negative" (Docket Entry 14 at 6 (citing Tr. 22)),

18

because she "was administered a[ straight leg raise] test on five different occasions and four out of those five were positive" (id. (citing Tr. 462, 718-19, 724, 728, 760)).  That challenge misses the mark, because the ALJ did not characterize Plaintiff's straight leg raise tests as "usually negative"; rather, the ALJ noted, accurately, that the only positive straight leg raise tests of record occurred in "December 2018 and January and November 2019." (Tr. 22.)

In short, Plaintiff has not shown that the ALJ improperly considered objective medical evidence in evaluating Plaintiff's subjective reports of pain and other symptoms.

b. **Explanation for Sit/Stand Option**

Next, Plaintiff faults the ALJ for "assign[ing] a random value to the number of minutes . . . [Plaintiff] c[ould] be expected to stand, walk or sit at one time," and contends that "[t]he ALJ's finding that [Plaintiff] could stand, sit and walk for 30 minutes at a time before needing to change positions ha[d] no basis in the testimony or the medical opinion evidence."  (Docket Entry 14 at 13.)  In Plaintiff's view, "'the ALJ must build an accurate and logical bridge from the evidence to h[er] conclusion that [Plaintiff]'s testimony was not credible,'" (id. (quoting Brown v. Commissioner of Soc. Sec. Admin., 873 F.3d 251, 269 (4th Cir. 2017), and citing Kenedy v. Saul, 781 F. App'x 184, 187 (4th Cir. 2019))), and maintains that "[t]he ALJ never explain[ed] how the

19

evidence demonstrate[d] that [Plaintiff] c[ould stand, walk, or sit] for 30 minutes at a time (or lift up to 20 pounds) as opposed to the only 15 minute intervals and less than 10 pounds of lifting which [she] testified she was capable of performing" (id.). In support of that argument, Plaintiff again points to her testimony (see id. at 3-4 (citing Tr. 46, 48-50, 52-56, 59-64)) and record evidence (see id. at 7-12 (citing Tr. 386, 459-62, 464-65, 472, 474, 574, 576, 658, 678-79, 686, 690-91, 700-01, 706, 717-19, 724, 727-28, 732-33, 737, 750, 757, 760-62, 764-65, 774, 777, 783, 789, 792-93, 798-802, 818-19, 878, 880, 928-31, 936, 948, 958-59, 1007-08, 1051, 1064, 1099, 1108, 1127, 1129-31, 1188, 1282, 1335, 1356, 1408, 1558-59)) that she believes should have compelled the ALJ to adopt greater exertional limitations in the RFC. (See id. at 13.) As the Court can trace the path of the ALJ's reasoning regarding the exertional limitations in the RFC, Plaintiff's arguments fall short.

Although Plaintiff correctly observes that the ALJ's RFC precisely mirrored neither Plaintiff's "testimony [n]or the medical opinion evidence" (id.), the ALJ labored under no requirement to fashion an RFC that exactly matched Plaintiff's testimony or the opinion evidence. As well-explained by a neighboring district court:

> [The plaintiff]'s argument that the ALJ's RFC assessment must be supported by the opinion of a medical expert is unavailing. The United States Court of Appeals for the Fourth Circuit and this [c]ourt have recognized that the

RFC assessment is an administrative finding rather than a medical finding. *Felton–Miller v. Astrue*, 459 F. App'x 226, 230-21 (4th Cir. 2011) (stating that RFC "is an administrative assessment made by the Commissioner based on all the relevant evidence in the case record") (citing 20 C.F.R. §§ 404.1546(c), 416.946(c)); *Youkers v. Colvin*, No. 3:12-9651, 2014 WL 906484, at *10 (S.D.W. Va. Mar. 7, 2014). Accordingly, an ALJ is not required to obtain an expert medical opinion as to a claimant's RFC. *Felton–Miller*, 459 F. App'x at 230-31; *Hucks v. Colvin*, No. 2:12-cv-76, 2013 WL 1810658, at *9 (N.D.W. Va. Apr. 3, 2013), *report and recommendation adopted by* 2013 WL 1810656 (N.D.W. Va. Apr. 29, 2013); *see also Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012) ("[T]here is no requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion on the functional capacity in question."); *Sullivan v. Comm'r of Soc. Sec.*, No. 2:13-cv-1460-KJN, 2014 WL 6685075, at *4 (E.D. Cal. Nov. 25, 2014) ("It is the ALJ's responsibility to formulate an RFC that is based on the record as a whole, and thus the RFC need not exactly match the opinion or findings of any particular medical source."); *Mitchell v. Comm'r of Soc. Sec.*, No. SAG-12-3332, 2013 WL 5182801, at *1 (D. Md. Sept. 12, 2013) ("An ALJ need not parrot a single medical opinion, or even assign 'great weight' to any opinions, in determining an RFC."); *Thomas v. Colvin*, No. 12-227-N, 2013 WL 1218920, at *8 (S.D. Ala. Mar. 25, 2013) (recognizing that RFC determination need not be supported by specific medical opinion); *Town v. Astrue*, No 3:12cv105, 2012 WL 6150836, at *4 (N.D. Ind. Dec. 10, 2012) ("The determination of an individual's RFC need not be based on a medical opinion because it is a determination reserved to the ALJ as fact-finder for the Commissioner."). Instead, an ALJ must consider all relevant evidence in the record, including the opinions of medical sources, and arrive at a determination of a claimant's RFC that is supported by substantial evidence.

<u>Fruit v. Colvin</u>, No. 2:14CV7643, 2015 WL 1021309, at *22 (S.D.W. Va. Mar. 9, 2015) (unpublished) (footnotes, emphasis, and stray period omitted).

Here, the ALJ's decision reveals that she found neither Plaintiff's testimony nor the medium-RFC opinions from the prior

21

ALJ and the state agency medical consultants fully persuasive and instead struck a balance between those two opposing viewpoints. More specifically, the ALJ acknowledged Plaintiff's testimony that she could "stand in one place for 15 minutes and walk for 15 minutes[ and] . . . that she ha[d] to change positions from sitting to standing" (Tr. 17; see also Tr. 59-60), as well as that she could not "carry a gallon of milk, even using both hands" (Tr. 17; see also Tr. 52), but found that "[Plaintiff]'s statements concerning the intensity, persistence and limiting effects of [her] symptoms [we]re not entirely consistent with the medical evidence and other evidence in the record" (Tr. 18 (emphasis added)). The ALJ also found "not persuasive" the opinions of the state agency medical consultants (Tr. 22 (emphasis added)), who found that Plaintiff remained capable of a wide range of medium work, including lifting amounts ranging from 20 to 50 pounds and sitting, standing, and walking for up to six hours with no limits on how long Plaintiff could maintain those exertional activities at one time (see Tr. 115, 133-34). In so doing, the ALJ expressly noted that the imaging evidence and Plaintiff's testimony warranted greater limitations. (Tr. 22.)[8] Thus, the ALJ's light-exertion RFC, which contains limitations to no more than 20 pounds of lifting and to no more than 30 minutes of sitting or

_____

[8] As discussed above, the ALJ also deemed "not persuasive" (Tr. 21) the prior ALJ's determination that Plaintiff remained capable of performing a nearly full range of medium work (see Tr. 87).

standing/walking at one time and for a total of four hours each in an eight-hour work day (see Tr. 16), clearly constitutes a reasonable compromise between the medium-RFC opinions of the prior ALJ and the state agency medical consultants and Plaintiff's alleged less-than-sedentary limitations. See Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990) ("Ultimately, it is the duty of the [ALJ] reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence." (citing King v. Califano, 599 F.2d 597, 599 (4th Cir. 1979))).

Moreover, the ALJ's discussion of the objective evidence further explains the RFC's exertional limitations. In that regard, the ALJ made the following observations:

- "[a]t a July 2018 physical consultative examination with William Gartlan, D.O., [Plaintiff] reported constant neck and back pain, but she was in no acute distress[ and, u]pon examination, she had tenderness to palpation of the bilateral cervical, trapezius, gluteal, supraspinatus, and knee tender points and generalized bilateral lower paravertebral lumbar tenderness[, but g]ait was normal and reciprocal, without the need for an assistive device[, s]trength and grip strength were 5/5 throughout, [] manipulative abilities were intact[, r]ange of motion was normal throughout, [] straight leg raising was negative bilaterally[, Plaintiff] had normal ability to walk on toe and heels, tandem walk, and squat[, and s]ensation and reflexes were intact" (Tr. 19 (internal parenthetical citation omitted) (citing Tr. 458-63));

- at emergency room visits in August and September 2018, Plaintiff had "normal range of motion, full strength, and normal sensation" (id. (citing Tr. 472-74, 574-76));

23

- at multiple office visits in late 2018 and early 2019, "objective findings were normal . . ., including no swelling or edema, 5/5 strength in all extremities, intact sensation and reflexes . . ., and normal gait" (id. (citing Tr. 706, 711, 732, 738, 742));

- "[a]t neurology visits from April 2019 through January 2020 most examinations were unremarkable" (id. (citing Tr. 749-806)), and "document[ed] normal objective findings, including no swelling or edema, 5/5 strength in all extremities, intact sensation and reflexes . . ., and normal gait" and, although Plaintiff "continued to report symptoms, [she] was generally in no apparent distress" (Tr. 19-20 (citing Tr. 755-56, 758, 770-71, 781, 790-91, 805)); and

- from January to August 2020, "signs and symptoms from [Plaintiff]'s spinal impairments have remained stable with continued conservative treatment, including Tizanadine [sic], naproxen, gabapentin" (Tr. 20 (citing Tr. 1049-1573)).

Such normal findings support the ALJ's decision to find Plaintiff's testimony regarding her exertional abilities not fully consistent with the evidence and to adopt lesser exertional limitations in the RFC.

Furthermore, by pointing to record evidence Plaintiff believes supports greater limitations on her exertional abilities (see Docket Entry 14 at 3-4 (citing Tr. 46, 48-50, 52-56, 59-64); see also id. at 7-12 (citing Tr. 386, 459-62, 464-65, 472, 474, 574, 576, 658, 678-79, 686, 690-91, 700-01, 706, 717-19, 724, 727-28, 732-33, 737, 750, 757, 760-62, 764-65, 774, 777, 783, 789, 792-93, 798-802, 818-19, 878, 880, 928-31, 936, 948, 958-59, 1007-08, 1051, 1064, 1099, 1108, 1127, 1129-31, 1188, 1282, 1335, 1356, 1408,

1558-59)), she misinterprets this Court's standard of review. The Court must determine whether substantial evidence, i.e., "more than a mere scintilla of evidence but . . . somewhat less than a preponderance," Mastro, 270 F.3d at 176 (brackets and internal quotation marks omitted), supported the ALJ's findings regarding Plaintiff's exertional abilities, and not whether other record evidence weighed against those findings, see Lanier v. Colvin, No. CV414-004, 2015 WL 3622619, at *1 (S.D. Ga. June 9, 2015) (unpublished) ("The fact that [the p]laintiff disagrees with the ALJ's decision, or that there is other evidence in the record that weighs against the ALJ's decision, does not mean that the decision is unsupported by substantial evidence.").

In sum, Plaintiff's first issue on review fails as a matter of law.

## 2. Constitutionality of SSA

Lastly, Plaintiff contends that "[t]he structure of the SSA is constitutionally invalid." (Docket Entry 14 at 14 (bold font omitted).) Specifically, Plaintiff asserts that "[t]he United States Supreme Court has held that it is unconstitutional for an executive agency to be led by a single individual who serves for a longer term than the President and can only be removed from his position for cause." (Id. (citing Seila Law LLC v. Consumer Fin. Prot. Bureau, 591 U.S. ___, ___, 140 S. Ct. 2183, 2197 (2020)).) According to Plaintiff, the "constitutionally invalid structure of

25

the [Consumer Financial Protection Bureau ('CFPB')] is identical to that of the SSA," in that "[t]he Commissioner of SSA is the singular head of the [SSA], serves for a six-year term, and cannot be removed by the President except for cause ('neglect of duty or malfeasance in office')." (Id. (quoting 42 U.S.C. § 902(a)(3)).) Plaintiff further maintains that "[t]he ALJ's delegation of authority in this case came from [then-Commissioner] Andrew Saul and is therefore constitutionally defective" (id. (citing Hearings, Appeals, and Litigation Law Manual (HALLEX) § I-2-0-2(A))), as well as that "the ALJ decided this case under regulations promulgated by [then-Commissioner] Saul when [he] had no constitutional authority to issue those rules" (id.). In Plaintiff's view, "the ALJ's decision must [] be vacated because she did not have the authority to decide the case given the delegation of authority from [then-]Commissioner [Saul] who had no constitutional authority to head the [SSA]." (Id. at 15.)

In response, the Commissioner concedes "that 42 U.S.C. § 902(a)(3) violates the separation of powers to the extent it is construed as limiting the President's authority to remove the Commissioner without cause." (Docket Entry 19 at 11 (citing U.S. Dep't of Justice ("DOJ"), Office of Legal Counsel, "Constitutionality of the Commissioner of Social Security's Tenure Protection," 2021 WL 2981542 (July 8, 2021) ("2021 OLC Op")).) However, the Commissioner notes that, "even where an

unconstitutional statutory removal restriction exists, a plaintiff seeking relief on that basis must show that the restriction actually caused her harm." (Id. at 12 (citing Collins v. Yellen, ___ U.S. ___, ___-___, 141 S. Ct. 1761, 1787–89 (2021)).) According to the Commissioner, Plaintiff's separation of powers argument fails because she cannot "show the required nexus between Section 902(a)(3)'s removal restriction and the denial of her benefits claim." (Id. (bold font and single-spacing omitted).) In that regard, the Commissioner asserts that:

> [U]nlike Appointments Clause defects, where the presiding official does not enjoy proper authority to occupy the office, *see Lucia v. SEC,* [585 U.S. ___,] 138 S. Ct. 2044 (2018), agency action is not *per se* invalid simply because it can be traced back to an official subject to an unconstitutional *removal* protection. *Collins,* 141 S. Ct. at 1788. The [Supreme] Court emphasized that "the unlawfulness of [a] removal provision" — the alleged constitutional defect both in *Collins* and here — "does not strip [an official] of the power to undertake the other responsibilities of his office." *Id.* at 1788 n.23. "As a result," the [Supreme] Court held, "there is no reason to regard *any* of the actions taken" by the agency during this period "as void." *Id.* at 1787 (emphasis added).

> Collins teaches, therefore, that regardless of the constitutionality of the removal restriction in 42 U.S.C. § 902(a)(3), a Senate-confirmed Commissioner subject to that removal restriction has full authority to carry out the responsibilities of his office, including promulgating regulations and delegating authority pursuant to the [] Act. . . .

> [R]elief is available in removal challenges only where the alleged injuries are caused by officials subject to the challenged removal restrictions, *and* where those restrictions themselves "inflicted compensable harm" upon plaintiffs. [Id.] at 1789. . . . To obtain a rehearing on separation of powers grounds, in other words,

27

Plaintiff must show that Section 902(a)(3)'s removal restriction somehow caused the denial of her benefits claim.

(Docket Entry 19 at 13-14 (stray space omitted).)

Although Plaintiff did not address those arguments by the Commissioner in Plaintiff's Reply (see Docket Entry 20 at 1-4), she did, in her principal brief, preemptively address arguments she anticipated the Commissioner would raise (see Docket Entry 14 at 15-19). In that regard, Plaintiff contends that she can establish the required nexus between the removal provision at issue and the denial of her SSI claim as follows:

> [T]he Commissioner's past representations of the *Collins* case have largely consisted of a patchwork of concurrences which do not have the force of law. The actual holding was much narrower, and the [Supreme] Court observed that harm could not be presumed in that case because it did not involve government actors exercising authority they did not lawfully possess. *See Collins*, 141 S. Ct. at 1788. By contrast, . . . this case involves an ALJ and Appeals Judge acting without a valid delegation of authority - thus as was the case in *Lucia* and *Carr*, harm is presumed. *See Lucia*, 585 U.S. [at ___-___], 138 S. Ct. at 2053-55; *see generally Carr*[ *v. Saul*, ___ U.S. ___,] 141 S. Ct. 1352[ (2021)].

> Regardless, [Plaintiff] was harmed by receiving unfavorable decisions from the ALJ and Appeals Council without constitutionally valid hearings and adjudication processes. *See* [Tr.] 1, 7.

(Docket Entry 14 at 17 (some spacing in citations altered).)

In contrast to Appointments Clause cases, where courts have found the very authority under which a government official has acted unconstitutional, <u>see, e.g.</u>, <u>Carr</u>, ___ U.S. at ___, 141 S. Ct. at 1356-62; <u>Lucia</u>, 585 U.S. at ___, 138 S. Ct. 2053-55; <u>Probst</u>

28

v. Saul, 980 F.3d 1015, 1023 (4th Cir. 2020), the unconstitutional removal provision at issue here did not impact then-Commissioner Saul's ability to carry out the duties of his office. Contrary to Plaintiff's above-quoted assertion (see Docket Entry 14 at 17), the core holding of the majority opinion in Collins (as well as in Seila Law) rejects Plaintiff's view of presumed harm from the unconstitutional removal provision, as recently well-explicated by another court:

> [The p]laintiff's argument is similar to arguments the plaintiffs raised and the [United States Supreme] Court rejected in Seila Law and Collins. First, like the plaintiffs in Seila Law, [the [p]laintiff here argues § 902(a)(3)'s removal provision automatically renders all agency action unconstitutional. The [Supreme] Court in Seila Law rejected such an argument[,] observing one section of a statute may violate the Constitution without rendering the entire act void. Seila Law, 140 S. Ct. at 2209. The [Supreme] Court stated the removal limitation of the CFPB Director is the only defect and removal of the defect removes the constitutional violation. The [Supreme] Court concluded the removal limitation was severable because the CFPB is capable of functioning independently of the infirm removal clause. Id. [] ("The provisions of the Dodd-Frank Act bearing on the CFPB's structure and duties remain fully operative without the offending tenure restriction. Those provisions are capable of functioning independently, and there is nothing in the text or history of the Dodd-Frank Act that demonstrates Congress would have preferred no CFPB to a CFPB supervised by the President."); see also [id.] at 2245.
>
> . . .
>
> The Supreme Court in Collins also rejected the argument an invalid removal provision rendered the FHFA's actions void from the outset. The Supreme Court stated there was "no reason to hold that the third amendment [to the agreement between the FHFA and the Department of Treasury] must be completely undone." Collins, [141 S.

29

> Ct.] at 1788. The Collins Court further stated
> "[a]lthough the statute unconstitutionally limited the
> President's authority to remove the confirmed Directors,
> there was no constitutional defect in the statutorily
> prescribed method of appointment to that office. As a
> result, there is no reason to regard any of the actions
> taken by the FHFA [challenged on appeal] as void." [Id.]
> at 1787. Accordingly, the argument the SSA's actions
> here are either void *ab initio* or became void at some
> later point due to § 902(a)(3)'s removal clause is not
> supported by either Seila Law or Collins

Lisa Y. v. Commissioner of Soc. Sec., 570 F. Supp. 3d 993, 1002-03

(W.D. Wash. 2021) (internal footnote, citation, and stray

parenthesis and period omitted); see also Fish v. Kijakazi, No.

5:21cv182, 2022 WL 1504887, at *6 (N.D.W. Va. Apr. 26, 2022)

(unpublished) ("Courts across the country have uniformly concluded

that the allegedly unconstitutional nature of 42 U.S.C. § 902(a)(3)

does not require remand." (citing cases)), recommendation adopted,

2022 WL 1498115 (N.D.W. Va. May 11, 2022) (unpublished); Robinson

v. Kijakazi, No. 1:20CV358, 2021 WL 4998397, at *3 (W.D.N.C. Oct.

27, 2021) (unpublished) ([The p]laintiff . . . offers no evidence

to show that there is a nexus between the unconstitutional removal

restriction and the denial of his application for disability

benefits[ and ] simply argues that all actions taken by the

Commissioner are void due to the unconstitutional removal

provision. However, Collins expressly rejects this view."

(internal citation omitted)), appeal filed, No. 21-2258 (4th Cir.

Nov. 9, 2021).

Plaintiff next maintains that she can demonstrate harm arising from the unconstitutionality of Section 902(a)(3), because "President Biden wished to terminate [then-]Commissioner Saul immediately upon assuming the Presidency" (Docket Entry 14 at 17) and, "[t]he day after DOJ issued its Memorandum Opinion in the wake of *Collins* confirming that [then-Commissioner] Saul could be removed from office by the President, President Biden immediately did so" (id. at 18 (citing Tafoya v. Kijakazi, 551 F. Supp. 3d 1054, 1058 (D. Colo. 2021))). According to Plaintiff, "[t]he White House's official statement on removing [then-Commissioner] Saul from office confirms that President Biden had wished to fire [then-]Commissioner Saul from the time of the President's inauguration [for] . . . 'undermin[ing] and politiciz[ing] Social Security disability benefits, terminat[ing] the agency's telework policy that was utilized by up to 25 percent of the agency's workforce, not repair[ing] SSA's relationships with relevant Federal employee unions including in the context of COVID-19 workplace safety planning, reduc[ing] due process protections for benefits appeals hearings, and tak[ing] other actions that run contrary to the mission of the agency and the President's policy agenda.'" (Id. (quoting https://federalnewsnetwork.com/people/2021/07/biden-fires-saul-as-ssa-commissioner).) Plaintiff points out that "the majority indicated in *Collins* that[, in] a situation where 'the President had made a public statement expressing displeasure with

31

actions taken by a Director and had asserted that he would remove the Director if the statute did not stand in the way, the statutory provision would clearly cause harm." (Id. (quoting Collins, 141 S. Ct. at 1789).) Accordingly, Plaintiff asserts that, "regardless of whether harm is presumed in this case, Collins dictates that Plaintiff has met her burden of demonstrating harm." (Id.) That argument lacks merit.

Another district court recently addressed and rejected such an argument:

> In her reply brief, [the p]laintiff argues "[then-Commissioner] Saul's actions, under constitutional authority or not, have caused specific harm by undermining, politicizing and reducing due process protections to [the p]laintiff's claims." This argument that there is a possibility § 902(a)(3) harmed [the p]laintiff fails to recognize the significant difference between the agency action in Collins and the SSA action here.

> In Collins, the Directors of the FHFA adopted an amendment (the "Third Amendment") to certain financial agreements that "materially changed the nature of the agreements" and resulted in the companies in which [the] plaintiffs were shareholders transferring to the U.S. Treasury "at least $124 billion dollars more than the companies would have had to pay" under the prior form of the agreements. Id. at 1774. The plaintiffs in Collins thus had an identifiable basis to contend that[,] but for the unconstitutional removal provision, the President may have removed and appointed a different Director who would have disapproved of the adoption (or implementation) of the Third Amendment. See id. at 1789.

> In contrast, there is nothing showing the Commissioner or the SSA implemented new and relevant agency action that may have turned upon the President's inability to remove the Commissioner. [The p]laintiff has not identified any new regulations, agency policies or directives [then-]Commissioner Saul installed that may have affected her

32

> claims. [The p]laintiff thus fails to show how or why
> § 902(a)(3)['s] removal clause possibly harmed her.

Lisa Y., 570 F. Supp. 3d at 1003 (internal citation omitted); see also id. at 1004 ("[A] conclusory allegation that due process was denied is not sufficient to raise a colorable constitutional claim." (citing Hoye v. Sullivan, 985 F.2d 990, 992 (9th Cir. 1992))); Shaun A. v. Commissioner of Soc. Sec., Civ. No. C21-5003, 2021 WL 5446878, at *5 (W.D. Wash. Nov. 22, 2021) (unpublished) ("[The p]laintiff's reference to an unnamed White House official's justification for Commissioner Saul's removal [does not] indicate that [the p]laintiff was harmed. . . . . Although a representative of the President suggested that Commissioner Saul was removed from office in part because he had undermined, politicized, and 'reduced due process protections for benefits appeals hearings,' this statement does not establish the existence of a due process violation and [the p]laintiff has failed to identify one."). Similarly, Plaintiff here has not pointed the Court to any "new regulations, agency policies or directives Commissioner Saul installed that may have affected her claims," Lisa Y., 570 F. Supp. 3d at 1003. (See Docket Entries 14, 20.)

Simply put, Plaintiff's second and final assignment of error entitles her to no relief.

## III. CONCLUSION

Plaintiff has not established grounds for reversal or remand.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, that Plaintiff's Motion for Judgment on the Pleadings (Docket Entry 13) be denied, that Defendant's Motion for Judgment on the Pleadings (Docket Entry 18) be granted, and that judgment be entered dismissing this action.

_____/s/ L. Patrick Auld_____
**L. Patrick Auld**
**United States Magistrate Judge**

July 21, 2022

34